IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**P.T.,** a minor, by and through her natural guardians Scott Tennant and Abigail Tennant, **G.H.,** a minor, by and through his natural guardians Glenn Hollabaugh and Trina Hollabaugh, **B.K.,** a minor, by and through her natural guardians Matthew Kennedy and Dia Kennedy, and **J.K.,** a minor, by and through her natural guardians Matthew Kennedy and Dia Kennedy,

      Plaintiffs,

   v.

EQT PRODUCTION COMPANY and EQT XL MIDSTREAM OPERATING LLC,

      Defendants.

CIVIL DIVISION

Case No. 2:25-cv-01203

## COMPLAINT AND JURY DEMAND

A. ***Preliminary Statement***

 1. Plaintiffs P.T., G.H., B.K., and J.K., each a minor, (collectively, "Plaintiffs"), by and through their respective natural guardians, bring this action to recover redress damages caused to them as a result of Defendants' negligent and reckless operations of a natural gas compressor station, natural gas wells, and their appurtenances. A jury trial is demanded.

B. ***Jurisdiction and Venue***

 2. This Court has original jurisdiction under 28 U.S.C. § 1332(a)(1) because complete diversity of citizenship exists between the Plaintiffs and Defendants and the amount in controversy exceeds $75,000.

 3. Venue is proper in this Court pursuant to 28 U.S.C. § 1392(b)(2) because Defendant EQT Production Company, Inc. is a Pennsylvania corporation, Defendant EQT XL Midstream Operating

LLC is a Delaware limited liability company, and their headquarters are located in Pittsburgh, Pennsylvania.

*C.*      ***The Parties***

4.      P.T. is a minor child who resided at 25511 Mountaineer Highway, Littleton, West Virginia 26581 during the events in question ("**P.T.'s Home**"); P.T. now resides at 114 Rural Street, Paden City, West Virginia 26159.

5.      G.H. is a minor child who resided at 25706 Mountaineer Highway, Littleton, West Virginia 26581 during the events in question ("**G.H.'s Home**"); G.H. now resides at 362 Madison Road, New Martinsville, West Virginia 26155.

6.      B.K. is a minor child who resided at 25513 Mountaineer Highway, Littleton, West Virginia 26581 during the events in question ("**B.K.'s Home**"); B.K. now resides at 2155 Mountaineer Highway, New Martinsville, West Virginia 26155.

7.      J.K. is a minor child who resided at 25513 Mountaineer Highway, Littleton, West Virginia 26581 during the events in question ("**J.K.'s Home**" and collectively with P.T.'s Home, G.H.'s Home, B.K.'s Home, and J.K.'s Home, the "**Homes**"); J.K. now resides at 2155 Mountaineer Highway, New Martinsville, West Virginia 26155.

8.      Defendant EQT Production Company ("**EQT Production Company**" and together with EQT Midstream, "**Defendants**") is a corporation duly formed under Pennsylvania law and its headquarters are located at 625 Liberty Avenue, Suite 1700, Pittsburgh, Pennsylvania 15222.

9.      Defendant EQT Production Company engages in for-profit natural gas operations, including exploration and production operations.

10.     Defendant EQT XL Midstream Operating LLC ("**EQT Midstream**") is a limited liability company duly formed under Delaware law and its headquarters are located at 625 Liberty

Avenue, Suite 1700, Pittsburgh, Pennsylvania 15222.

11.     Defendant EQT Midstream engages in for-profit midstream operations in West Virginia.

**D.**     ***Factual Background***

    *a.*   ***EQT Midstream's Operations***

12.     EQT Midstream owns and operates the Knob Fork Compressor Station and its appurtenances located on Mountaineer Highway, Littleton, Wetzel County, West Virginia (the "**Compressor Station**").

13.     Upon information and belief, in and around 2010, the Compressor Station was constructed and thereafter operated to process and compress natural gas using at least six 1,775 horsepower engines.

14.     The Compressor Station is clearly an industrial use as it processes raw materials and unlike well development, the intensity of activities at the Compressor Station remained constant.

15.     The Compressor Station generated construction emissions and operational emissions.

16.     EQT Midstream did not disclose to Plaintiffs' guardians all the chemicals it used and emitted in the construction and operation of the Compressor Station.

17.     As reported by EQT Midstream, the Compressor Station's operational emissions include air pollutants hazardous to the environment and human health such as nitrogen oxides, carbon monoxide, sulfur dioxide, particulate matter, carbon dioxide equivalents, and volatile organic compounds such as benzene, toluene, ethylbenzene, xylene, butane, hexane, methyl pentane, and formaldehyde; this is not an exhaustive list of the chemicals used or pollutants emitted. *See* **Exhibit A.**

18.     Due to the lack of full disclosure by EQT Midstream, the Plaintiffs have been unwittingly exposed to hazardous chemicals, thwarting their ability to identify their exposure and ultimately, meaningful medical care.

19. It was technologically impossible for EQT Midstream to prevent all emissions of hazardous pollutants from the Compressor Station.

20. The air emissions from the Compressor Station polluted the environment around the Homes and such pollution permeated the interior of the Homes, which sickened the Plaintiffs, as evidenced by, *inter alia*, toxicology testing that was performed on the Plaintiffs.

21. The Compressor Station generated noise pollution that harmed the Plaintiffs.

22. The foregoing operations of EQT Midstream are collectively referred to herein as "**EQT Midstream's Operations**".

23. P.T.'s Home is within approximately 2,700 feet of the Compressor Station.

24. G.H.'s Home is within approximately 3,400 feet of the Compressor Station.

25. B.K's Home and J.K.'s Home are within approximately 2,500 feet of the Compressor Station.

26. The Homes of P.T., B.K, and J.K. are down-gradient and sit at a lower elevation than the Compressor Station; G.H.'s Home is at a level elevation to the site.

    *b.* ***EQT Production's Operations***

27. Defendant EQT Production constructed and operated 8 unconventional natural gas wells (*see infra*) and their appurtenances on Country Road 7/16, Littleton, Wetzel County, West Virginia (collectively, "**Gas Wells**").

28. The site of the Gas Wells was developed in different stages:

    a. During construction, the impacts were typical of any noisy, dusty construction site, and the process can take several months to complete.

    b. Upon completion of the pad, drilling entailed twenty-four (24) hour operations of sizeable drilling rigs accompanied by numerous diesel engines to provide power to

4

the site.

    c.  Once completed, the pad included wellheads, condensate tanks, vapor destruction units with open flames, pipelines, metering stations, above-ground storage tanks, and other appurtenances.

    d.  EQT Production's construction and operation of the Gas Wells was a heavy industrial use and had significant and negative impacts to the Plaintiffs and their environment, including drilling, exploration and extraction, pipeline construction, gas transportation, waste storage, waste transfer, fracking fluid transfer, transfer of other substances, venting, condensate tanks, above ground waste water pipelines, equipment storage, hydraulic fracturing, flaring, heavy equipment use, excessive truck traffic, vapor destruction units, BTEX tanks, and transportation of oversized loads.

29.    Upon information and belief, on average there are over 1,600 chemicals used in hydraulic fracturing.

30.    EQT Production did not disclose all of the chemicals it used on the Sizemore Pad during construction and operational periods to the Plaintiffs' guardians.

31.    Each of the Gas Wells emitted air pollution hazardous to the environment and human health such as volatile organic compounds (VOCs) like benzene, toluene, and formaldehyde, as well as nitrogen oxides and other compounds.

32.    EQT Production used over two hundred three million five hundred thousand gallons of base water to hydraulically fracture the Gas Wells ("Water"). *See* **Exhibit B** (Total Base Water Volume).

33.    EQT Production reported adding certain toxic and hazardous chemicals to the Water for hydraulic fracturing of the Gas Wells with the FracFocus Registry, which is not an exhaustive list of the

chemicals used in the hydraulic fracturing of the Gas Wells ("**Hazardous Chemicals**"):

    a.    Sizemore 3H, with reported production commencing in November 2021 – EQT reported using toxic and hazardous chemicals during hydraulic fracturing, including *inter alia* silica substrate, copolymer of 2-propenamide, petroleum distillate, hydrogen chloride, glutaraldehyde, methanol, acetic acid, bis(HexaMethylene Triamine Penta(Methylene Phosporic Acid), Oleic Acid Diethanolamide, Quaternary Ammonium Compounds, Butyl cellosolve, Didecyl dimethyl ammonium chloride, Amides, From Diethylenetriamone, alkenoic Acid and tall oil fatty acids, Propargyl alcohol, ethanol, and petroleum naptha;

    b.    Sizemore 5H, with reported production commencing in November 2021 – EQT reported using toxic and hazardous chemicals during hydraulic fracturing, including *inter alia* silica substrate, copolymer of 2-propenamide, petroleum distillate, hydrogen chloride, glutaraldehyde, methanol, acetic acid, bis(HexaMethylene Triamine Penta(Methylene Phosporic Acid), ammonium chloride, Oleic Acid Diethanolamide, Quaternary Ammonium Compounds, Didecyl dimethyl ammonium chloride, Propargyl alcohol, and ethanol;

    c.    Sizemore 7H, with reported production commencing in November 2021 - EQT reported using toxic and hazardous chemicals during hydraulic fracturing, including *inter alia* silica substrate, copolymer of 2-propenamide, petroleum distillate, hydrogen chloride, glutaraldehyde, methanol, acetic acid, bis(HexaMethylene Triamine Penta(Methylene Phosporic Acid), ammonium chloride, Oleic Acid Diethanolamide, Quaternary Ammonium Compounds, Didecyl dimethyl ammonium chloride, Propargyl alcohol, and ethanol;

d.  Sizemore 9H, with reported production commencing in December 2021 - EQT reported using toxic and hazardous chemicals during hydraulic fracturing, including *inter alia* silica substrate, copolymer of 2-propenamide, petroleum distillate, hydrogen chloride, glutaraldehyde, methanol,  acetic acid, bis(HexaMethylene Triamine Penta(Methylene Phosporic Acid), ammonium chloride, Oleic Acid Diethanolamide, Quaternary Ammonium Compounds, Didecyl dimethyl ammonium chloride, Propargyl alcohol, and ethanol;

e.  Sizemore 11H, with reported production commencing in December 2021 - EQT reported using toxic and hazardous chemicals during hydraulic fracturing, including *inter alia* silica substrate, copolymer of 2-propenamide, petroleum distillate, hydrogen chloride, glutaraldehyde, methanol,  acetic acid, bis(HexaMethylene Triamine Penta(Methylene Phosporic Acid), ammonium chloride, Oleic Acid Diethanolamide, Quaternary Ammonium Compounds, Didecyl dimethyl ammonium chloride, Propargyl alcohol, ethanol, Amides, From Diethylenetriamone, alkenoic Acid and tall oil fatty acids**,** and petroleum naptha;

f.  Sizemore 13H, with reported production commencing in December 2021 - EQT reported using toxic and hazardous chemicals during hydraulic fracturing, including *inter alia* silica substrate, copolymer of 2-propenamide, petroleum distillate, hydrogen chloride, glutaraldehyde, methanol,  acetic acid, bis(HexaMethylene Triamine Penta(Methylene Phosporic Acid), ammonium chloride, Oleic Acid Diethanolamide, Quaternary Ammonium Compounds, Didecyl dimethyl ammonium chloride, Propargyl alcohol, and ethanol;

g.  Sizemore 15H, with reported production commencing in December 2021 - EQT reported

using toxic and hazardous chemicals during hydraulic fracturing, including *inter alia* silica substrate, copolymer of 2-propenamide, petroleum distillate, hydrogen chloride, glutaraldehyde, methanol,  acetic acid, bis(HexaMethylene Triamine Penta(Methylene Phosporic Acid), ammonium chloride, Oleic Acid Diethanolamide, Quaternary Ammonium Compounds, Didecyl dimethyl ammonium chloride, Propargyl alcohol, and ethanol; and

h. Sizemore 17H, with reported production commencing in December 2021 - EQT reported using toxic and hazardous chemicals during hydraulic fracturing, including *inter alia* silica substrate, copolymer of 2-propenamide, petroleum distillate, hydrogen chloride, glutaraldehyde, methanol,  acetic acid, bis(HexaMethylene Triamine Penta(Methylene Phosporic Acid), ammonium chloride, Oleic Acid Diethanolamide, Quaternary Ammonium Compounds, Didecyl dimethyl ammonium chloride, Propargyl alcohol, and ethanol.

*See* **Exhibit B**.

34. On August 25, 2021, it was disclosed that EQT Production's air emissions would include, *inter alia*:

a. NOX : 16.26 tpy

b. CO: 12.41 tpy

c. VOC: 6.01 tpy

d. SO2: 0.11 tpy

e. PM10/2.5: 1.12 tpy

f. Formaldehyde: 0.01 tpy

g. n-hexane: 0.29 tpy

h.  Total HAP: 0.33 tpy

i.  Carbon Dioxide Equivalents (CO2e): 22,263

35.  The Water and Hazardous Chemicals were mixed and used for injection into the Gas Wells to hydraulically fracture the targeted shale.

36.  In order to reach the targeted shale, the drilling process included drilling through subsurface sources such as bedrock and soil that contain Naturally Occurring Radioactive Material ("NORM") such as radium and uranium; the alteration and use of NORM generated Technologically Enhanced Naturally Occurring Radioactive Material such as radium-226, radium-228, and radon ("TENORM").

37.  The subsequent return of the mixed Water, Hazardous Chemicals, and TENORM included solid waste (e.g. drill cuttings) and wastewater (e.g. produced water or flowback) (collectively, "Mixed Hazardous and Radioactive Oil and Gas Waste"); this waste is inherent to EQT Production's operations.

38.  Mixed Hazardous and Radioactive Oil and Gas Waste was generated by each Gas Well and stored on the pad, generating the emission of pollutants, including radioactive particulate, that were hazardous to the environment and human health.

39.  It was technologically impossible for EQT Midstream to prevent all emissions of hazardous pollutants from the Gas Wells.

40.  There was a spill of pollutants on the pad in January 2022 resulting from a 6-inch rip in the containment area under the onsite tanks.

41.  In July 2022, the pad was recorded through the lens of a FLIR GF320, a camera specially calibrated to detect invisible hydrocarbons and volatile gasses.

42.  The recording revealed a long, continuous plume steadily flowing from the pad's vapor

9

destruction unit toward the Homes.

43.     Later, EPA investigators aimed a FLIR camera at the BTEX tanks and pollution control equipment, finding hydrocarbon emissions "from multiple points."

44.     A March 2023 EPA inspection found leaks and unexpected hydrocarbon emissions from EQT's pollution control devices in Sizemore operations.

45.     The EPA then opened a broader investigation, probing the firm's operations throughout West Virginia and seeking information about EQT's storage vessels, pollution control and VOC emissions data statewide.

46.     At the center of the probe is the company's pollution control equipment intended to combust emitted VOCs, including benzene, which is known to cause cancer and other serious health problems.

47.     In total, equipment in and around the Homes was permitted annually to release, among other pollutants, more than 30 tons of VOCs, nearly 34 tons of nitrous oxide and more than 31 tons of carbon monoxide.

48.     From 2013-2022, EQT Production injected 258 wells in West Virginia with at least one trade secret chemical, resulting in the use of 5,800,000 pounds of trade secret chemicals; EQT Production's Hazardous Chemicals mixed with the Water for hydraulic fracturing included trade secret chemicals for the Gas Wells. *See* Exhibit B.

49.     Due to the lack of full disclosure by EQT Production, the Plaintiffs have been unwittingly exposed to hazardous chemicals, thwarting their ability to identify their exposure and ultimately, obtaining meaningful medical care.

50.     P.T.'s Home was within approximately 1,700 feet of the Gas Wells.

51.     G.H.'s Home was within approximately 2,400 feet of the Gas Wells.

52. B.K's Home and J.K.'s Home was within approximately 2,000 feet of the Gas Wells.

53. The Homes are down-gradient and sit at a lower elevation than the Gas Wells.

54. Plaintiffs may discover additional infrastructure that Defendants may have owned or operated in and around the Homes that contributed to the impacts on Plaintiffs.

55. The infrastructure and operations described above with respect to EQT Production's operations are referred to herein as "**EQT Production's Operations**" and together with EQT Midstream's Operations, "**Defendants' Operations**".

56. The Defendants' ultimate parent company, EQT Corporation, is a publicly traded company, and in its 2021 10-k statement to the Securities and Exchange Commission included:

    a. "Drilling for and producing natural gas is a high-risk and costly activity with many uncertainties;

    b. "Many factors may curtail, delay, or cancel our scheduled drilling projects, including the following…environmental hazards, such as natural gas leaks, oil and diesel spills, pipeline and tank ruptures, encountering naturally occurring radioactive materials, and unauthorized discharges of brine, well stimulation and completion fluids, toxic gases or other pollutants into the surface and subsurface environment…any of these risks can cause a delay in our development program or result in substantial financial losses, personal injury or loss of life, damage to or destruction of property, natural resources and equipment, pollution, environmental contamination or loss of wells and other regulatory penalties.

    **c.** "Our business is subject to all of the inherent hazards and risks normally incidental to drilling for, producing, transporting and storing natural gas, NGLs and oil, such as…environmental hazards, such as natural gas leaks, oil and diesel spills, pipeline and

tank ruptures, encountering naturally occurring radioactive materials, and unauthorized releases of brine, well stimulation and completion fluids, toxic gases or other pollutants into the environment…We also face various risks or threats to the operation and security of our or third parties' facilities and infrastructure, such as processing plants, compressor stations, and pipelines. Any of these risks could result in substantial losses due to personal injury and/or loss of life, severe damage to and destruction of property, equipment and natural resources, pollution or other environmental damage…"

d. "As a result of these risks, we are also sometimes a defendant in legal proceedings and litigation arising in the ordinary course of business. There can be no assurance that the insurance policies we maintain to limit our liability for such losses will be adequate to protect us from all material expenses related to potential future claims for personal injury and property damage or that such levels of insurance will be available in the future at economical prices or to cover all risks. In addition, pollution and environmental risks generally are not fully insurable, and we may elect not to obtain insurance for any or all of these risks if we believe that the cost of available insurance is excessive relative to the risks presented. The occurrence of an event that is not fully covered by insurance could materially adversely affect our business, results of operations, cash flows and financial position."

*See* Exhibit C.

c.  ***Defendants' Risks to and Impacts on the Plaintiffs***

57.    The guardians of the Plaintiffs had purchased and resided in the Homes prior to the Defendant's development of the Operations.

58.    The pollution generated by the Gas Wells commencing in and around 2021 increased the

air pollution that the Plaintiffs were already being exposed to by the Compressor Station.

59.    The health impacts of living near oil and gas operations like EQT's in this matter are well documented and confirmed in numerous peer reviewed health studies.[1]

60.    When inhaled, volatile organic compounds that were emitted by the Defendants' Operations are known to cause dizziness, headaches, tremors, anxiety, confusion, nerve damage, muscle fatigue and, at high levels, death; some are also known to cause cancer.

61.    Studies on public health impacts have reported that proximity to fracking operations may be linked to adverse health outcomes such as increased risk of juvenile leukemia in children, associations of migraines, fatigue, and chronic rhinosinusitis, and more adverse prenatal, respiratory, cardiovascular, and carcinogenic outcomes (St. Martin, 2022; Harvard School of Public Health, 2022; Hall, 2016).[2]

62.    In August 2023, the Pennsylvania Department of Health and the University of Pittsburgh published the results of three health studies pertaining to childhood cancer, asthma, and lower birthweights.[3] The results found that for those living within 1 mile (5,280 feet) of oil and gas operations like EQT's, children have a 5-7 times higher risk of developing a rare childhood cancer, residents of all ages have an increased risk of severe asthma reactions, and babies are born at a lower birthweight.

63.    Emissions from shale gas compressor stations are known to cause both acute and chronic health impacts, such as an increase in the risk of cancer, asthma, cardiovascular, neurological, developmental, and respiratory diseases; some occur at a relatively steady rate, while others occur in episodic peaks.

64.    Asthma, nosebleeds, headaches, rashes, weakness, fatigue, muscle pain can occur in

---

[1] Physicians for Social Responsibility' fracking "Compendium," a collection of some 2,000 abstracts of and links to medical, scientific and investigative reports about the consequences of oil and gas drilling, fracking, and infrastructure: https://psr.org/resources/fracking-compendium-9/
[2] Pennsylvania Emergency Management Agency 2023 Hazard Mitigation Plan at 566:
https://www.pa.gov/content/dam/copapwp-pagov/en/pema/documents/mitigation/planning/documents/2023%20hazard%20mitigation%20plan.pdf
[3] https://www.fractracker.org/2023/08/pennsylvania-health-study-results/

those living near compressor stations.

65.     Weather conditions and wind direction may affect an individual's actual exposure; as a result of these factors, acute health symptoms may be persistent, episodic, or temporary.

### i.  Impacts to P.T.

66.     P.T. was born prior to the commencement of the Defendants' Operations.

67.     Medical testing identified that P.T. was exposed to benzene, toluene, xylene, styrene, phthalates, and MTBE.

68.     The disclosure by EQT Midstream include emissions of VOCs like benzene, toluene, xylene, and styrene. *See* Exhibit A.

69.     The disclosure by EQT Production include emissions of VOCs like benzene, toluene, xylene, and styrene. *See* Exhibit B.

70.     P.T.'s hair sampling also detected, among others, very high levels of calcium, antimony, lead, nickel, and barium.

71.      P.T. has experienced anemia, gastro-intestinal issues, cognitive issues, headaches, chest pain, shortness of breath, rashes across her body, ear ringing, dizziness, nausea, depression, anxiety, emotional distress, scoliosis, development of allergies, including to antibiotics, and was often lethargic and slept for unusually long periods of time.

72.     P.T. enjoyed playing with her friends B.K. and J.K., they were nicknamed PB&J, and P.T. engaged in various outdoor activities like swinging, gardening, and exploring the woods; these relationships have become strained because being in contact is a stressful reminder of the injuries they sustained when they lived in their Homes.

73.     P.T. enjoyed fishing, cooking out, playing in the snow, and playing with the family's dogs.

74.    As indicated above and as a result of Defendants' Operations, P.T. developed severe health issues, *inter alia* rashes, labored breathing, and headaches, which forced her to stay indoors and the chemical exposure led to lethargy and depression.

75.    As indicated above, P.T.'s health worsened with neurological disorders, scoliosis, and hip dysplasia, necessitating multiple surgeries and hospitalizations.

76.    P.T.'s chronic anemia, along with anxiety, depression, PTSD, and scoliosis, now limits her activity and causes her to sleep 12-15 hours a day, affecting her ability to live a normal teenage life.

77.    P.T.'s health issues, requiring medication, therapy, and frequent medical appointments, have strained her friendships and daily interactions.

78.    P.T.'s future is uncertain due to her health issues, which have impacted her ambitions and dreams, leaving her worried about potential long-term effects from the exposure to Defendants' Operations.

79.    Despite these challenges, P.T. remains determined to pursue a career in Criminal Psychology, even as her reality involves frequent medical appointments and health monitoring.

80.    P.T.'s 6th, 7th, and 8th grade years were challenging as effort caused headaches, minimal tasks couldn't be completed and thinking and concentrating were difficult.

81.    P.T. continues to have trouble breathing and is dizzy and nauseous almost daily.

82.    P.T. used to take dance lessons but with impacts of the toxic exposure, B.K. lost her confidence and skills.

83.    P.T. has had to seek counseling to regain confidence to move forward.

84.    Because of Defendants' harms to P.T., the family was forced to abandon the Home when P.T. was 13.

ii.    ***Impacts to G.H.***

85.     G.H. was born prior to the commencement of the Defendants' Operations.

86.     Medical testing identified that G.H. was exposed to xylene, toluene, benzene, styrene, phthalates, paraben, and MTBE.

87.     The disclosure by EQT Midstream include emissions of VOCs like benzene, toluene, xylene, and styrene. *See* Exhibit A.

88.     The disclosure by EQT Production include emissions of VOCs like benzene, toluene, xylene, and styrene. *See* Exhibit B.

89.     G.H. has experienced weight loss, respiratory issues, fatigue, headaches, rashes, nauseous, gastrointestinal issues, cognitive issues, ringing in the ears, and emotional distress.

90.     G.H. has been diagnosed with a connective tissue disorder not caused by genetics, (silica, like that emitted from EQT Production, has been linked to connective tissue disorders) joint issues, scoliosis, nodules on his thyroid, depression, anxiety, and anemia, and has had clamps inserted into his lungs.

91.     Now, G.H. is also at risk of losing his ability to walk and eyesight as a result of his illnesses and symptoms.

92.     Because of Defendants' injuries to G.H., the family was forced to abandon the Home when G.H. was  14.

93.     The Home was close to G.H.'s extended family, and the family was close to their neighbors, their church, and G.H.'s school.

94.     G.H. liked the big yard at the Home, the nearby creek, hunting, fishing, camping, camp fires, and catching crawdads, and his love of nature and respect for the land grew.

95.     G.H. also enjoyed climbing trees, playing  football, baseball and other games like slip n' slides.

96.     As G.H.'s illnesses worsened, he could no longer engage in outdoor activities like running, playing, swimming, hunting, or enjoying fresh air.

97.     G.H.'s injuries also prevented him from lifting weights, horseplay, riding bikes, climbing trees, or doing hard physical labor.

98.     G.H. wanted to be a welder and now knows that he cannot pursue his chosen career as he cannot be around welding operations or carry heavy equipment because of his connective tissue disorder; G.H. cannot stand long enough or be in one position long enough to do the perform the tasks of welding.

99.     Being sickened and forced to move from the Home affected every part of G.H.'s life – he experienced a loss of friends, his social life, having other family nearby; it only took four minutes to drive to his church and to enjoy youth groups.

100.    G.H. now lives in a smaller home with his family and G.H. is forced to share an attic room with his older brother when he used to have his own bedroom.

101.    G.H. has had to have multiple surgeries for his lungs and tissue disorder; the current home is further away from emergency medical providers as well as his doctors and hospitals.

102.    G.H. has had to seek counseling to regain confidence to move forward.

### iii. *Impacts to B.K.*

103.    B.K. was born prior to the commencement of the Defendants' Operations.

104.    B.K. has experienced rashes, fatigue, respiratory issues, shortness of breath, headaches, abdominal pain, fluid retention, inflammation, anxiety, depression, emotional distress, panic attacks, and hot flashes.

105.    B.K.'s medical testing revealed that she had levels of xylene, toluene, styrene, phthalates, and benzene exposure 91 times higher than the average American.

106.    The disclosure by EQT Midstream include emissions of VOCs like benzene, toluene,

xylene, and styrene. *See* Exhibit A.

107.    The disclosure by EQT Production include emissions of VOCs like benzene, toluene, xylene, and styrene. *See* Exhibit B.

108.    Because of Defendants' harms to B.K., the family was forced to abandon the Home when B.K. was 11.

109.    B.K. loved being outdoors and played on her swing set, rode bikes, fished in the family's pond, hunted, rode 4 wheelers, enjoyed sleigh riding and swimming, and helped with the family's cattle.

110.    As the pollution from Defendant's operations worsened, B.K. was not allowed to be outside for long periods of time because of the pollution making her short of breath, bloated, and giving her headaches.

111.    Since moving out of the Home, B.K. has had issues breathing when doing physical activities for long periods of time and B.K. has even been prescribed an inhaler.

112.    B.K. used to take dance lessons but with impacts of the toxic exposure, B.K. lost her confidence and skills.

113.    B.K. will not have the opportunity to finish her childhood in the family Home or build on the family property of 87 acres because it has been permanently damaged.

114.    B.K. was once best friends with their neighbor P.T., now have a strained relationship due to shared trauma and struggling to explain their emotional experience to school friends while maintaining honor roll despite losing their childhood home.

115.    B.K. now plays some school sports but has had to seek counseling to regain confidence to move forward.

      iv.    ***Impacts to J.K***

116.    J.K. was born two years after the commencement of EQT Midstream's Operations and

prior to EQT Production's Operations.

117.    J.K. has experienced fatigue, anemia like symptoms, neuropathy, headaches, nosebleeds, eczema, leg pain, and emotional distress.

118.    Medical testing identified levels of xylene, benzene, styrene, and MTBE.

119.    The disclosure by EQT Midstream include emissions of VOCs like benzene, toluene, xylene, and styrene. *See* Exhibit A.

120.    The disclosure by EQT Production include emissions of VOCs like benzene, toluene, xylene, and styrene. *See* Exhibit B.

121.    Because of Defendants' harms to J.K., the family was forced to abandon the Home when J.K. was 9.

122.    J.K. loved being outdoors and played on swing set, rode bikes, fished in the family's pond, hunted, rode 4 wheelers, enjoyed sleigh riding and swimming, and helped with the family's cattle.

123.    As the pollution from Defendant's operations worsened, J.K. was not allowed to be outside for long periods of time because of the pollution making her short of breath, bloated, and giving her headaches.

124.    Since moving out of the Home, J.K. has had issues breathing when doing physical activities for long periods of time.

125.    J.K. used to take dance lessons but with impacts of the toxic exposure, J.K. lost her confidence and skills.

126.    J.K. will not have the opportunity to finish her childhood in the family Home or build on the family property of 87 acres because it has been permanently damaged.

127.    J.K. was once best friends with their neighbor P.T., now have a strained relationship due to shared trauma and struggling to explain their emotional experience to school friends while maintaining

honor roll despite losing their childhood home.

128.    J.K. now plays some school sports but has had to seek counseling to regain confidence to move forward.

### v. As to all Plaintiffs

129.    Plaintiffs suffered the loss of a healthy and clean environment, causing health injuries, loss of use and enjoyment of their Homes, loss of quality of life, emotional distress, and other damages.

130.    Plaintiffs' injuries and damages are a direct result of Defendants' grossly negligent and reckless operations and the nuisances such Operations created.

131.    Regardless of the express requirements of applicable law, general duties of care and safety require that the Operations not create nuisances that sickens children like the Plaintiffs.

132.    There are no other sources of the pollution that caused the impacts to the Plaintiffs.

## COUNT I: PRIVATE NUISANCE

133.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

134.    Plaintiffs resided in the Homes and had the right to a clean environment and to breathe clean air.

135.    Each Defendant polluted the environment in and around the Homes.

136.    Private nuisance is when the activities of another encroaches upon another's interest in the private use and enjoyment of land, and the encroachment is either intentional and unreasonable, or unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

137. Each Defendant, by their acts and/or omissions, including those of their officers, agents, and/or employees, caused an unreasonable and substantial interference with Plaintiffs' rights to use and enjoy their Homes, the surrounding environment, and their health.

138. The Defendants had a duty to not pollute the environment in and around the Homes.

139. Defendant EQT Midstream owned and operated the Compressor Station that unreasonably polluted the Plaintiffs' environment with known and unknown hazardous and abnormally dangerous chemicals and TENORM.

140. Defendant EQT Production owned and operated the Gas Wells that unreasonably polluted the Plaintiffs' environment with known and unknown hazardous and abnormally dangerous chemicals.

141. Defendants' pollution sickened the Plaintiffs and prevented the Plaintiffs from living in their Homes and enjoying the surrounding environment.

142. Defendants intentionally and unreasonably polluted the air and environment in and around the Homes.

143. Defendants knew that the air pollution was harmful to Plaintiffs' health and environment and encroached upon the Plaintiffs' private use and enjoyment of their Homes and surrounding environment.

144. Said contamination and pollution encroached upon the Plaintiff's private use and enjoyment of the Property.

145. Defendants, including their officers, agents and/or employees, created and maintained a continuing nuisance affecting the Plaintiffs, their environment, and their Homes, by allowing inherent risks and hazards to persist, resulting in  exposure and injuries to Plaintiffs.

146. Defendants knowingly exposed Plaintiffs, who were unwitting children, to known and unknown hazardous, carcinogenic, and radioactive pollutants, sickening them and forcing them to leave their childhood homes.

147. Defendants' conduct was outrageous and so extreme and offensive that Defendants went beyond all possible bounds of decency and such conduct is intolerable in a civilized society.

148. Plaintiffs in no way contributed to the damages and injuries they have sustained.

149. Defendants, by reason of this private nuisance, are each liable for all the damages, including punitive damages, and injuries to Plaintiffs proximately caused by Defendants' Operations.

## COUNT II: NEGLIGENCE

150. Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

151. Defendants' failed to provide oversight of each of their Operations and allowed their Operations to unreasonably and intentionally pollute the environment and sicken children like Plaintiffs.

152. Defendants had a duty of care to ensure that their operations would not pollute the environment and sicken children like Plaintiffs.

153. The Operations conducted by Defendants allowed hazardous and radioactive pollutants to enter the environment and the Homes, sickening Plaintiffs.

154. Defendants' breached the duty to prevent such pollution of the Plaintiffs' environment and Homes by conducting the Operations in a manner that allowed and cause

said pollution to occur.

155.    The Plaintiffs were injured, and there are numerous medical health issues affecting the Plaintiffs, pain-and-suffering, attorneys fees, loss of use and enjoyment, and other damages referenced in this Complaint.

156.    The negligent actions of Defendants are the cause of the Plaintiffs' damages because the damages suffered by the Plaintiffs are from the Operations, and the effects thereof, including mixed hazardous and radioactive pollutants that were released, emitted, or otherwise negligently used and employed by the Defendants.

157.    Defendants., including their officers, agents, and/or employees knew, or in the exercise of reasonable care should have known, of the dangerous, offensive, hazardous or toxic nature of the pollution from their Operations, and that they were capable of causing serious personal injury to children coming into contact with them, polluting the environment and Homes of the Plaintiffs, yet Defendants did not warn Plaintiffs.

158.    Defendants, including their officers, agents, and/or employees knew, or in the exercise of reasonable care should have known, that once emissions of hazardous and radioactive pollutants occurred, they should take reasonable measures to protect children and the public, including by issuing immediate and adequate warnings to nearby residents, including Plaintiffs.

159.    Defendants, including their officers, agents, and/or employees knew, or in the exercise of reasonable care should have known, that the pollution caused by the Defendants' grossly negligent, reckless, and outrageous conduct, and the resultant harm to Plaintiffs, were foreseeable and inevitable consequences of the Operations, and acts and/or omissions in the manner in which they engaged in the Operations.

160.    Some or all of the acts and/or omissions of the Defendants were grossly, knowingly, recklessly and wantonly negligent, and were done with utter disregard for the consequences to Plaintiffs and other children, and therefore Plaintiffs are entitled to an award of punitive damages.

161.    Defendants' conduct was outrageous and so extreme and offensive that Defendants' went beyond all possible bounds of decency and such conduct is intolerable in a civilized society.

162.    Defendants' acts and/or omissions mentioned herein were the direct and proximate cause of the damages and injuries to Plaintiffs.

163.    Plaintiffs in no way contributed to the damages and injuries they have sustained.

164.    Defendants, by reason of their negligence, are liable for all the damages, including punitive damages, and injuries to Plaintiffs proximately caused by the pollution caused by their Operations.

## COUNT III: STRICT LIABILITY

165.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

166.    Defendants knew their Operations were ultrahazardous, inherently and abnormally dangerous, emitted toxic and hazardous pollutants like benzene and TENORM, and could not be mitigated, and that the risk of injuries to children like Plaintiffs and the environment were likely to be injurious to Plaintiffs and the environment.

167.    The Defendants did not and have not fully disclosed all of the chemicals and constituents that they used in their Operations that could be present in the emissions.

168.    The nondisclosure of said chemicals to Plaintiffs, surrounding residents and other persons is also ultrahazardous because Defendants have intentionally and

deliberately prevented Plaintiffs from having any knowledge or existence of all the hazardous and radioactive pollutants that they have been exposed to.

169.    It was technologically impossible for the Defendants to prevent the emissions that sickened Plaintiffs, knowing that such Operations are inherently dangerous, knowingly and recklessly continued their Operations anyway.

170.    The theory of strict liability in tort remains open to plaintiffs in West Virginia on a case-by-case basis and as warranted by a fully developed record after an opportunity for discovery.

171.    Because the Operations were ultrahazardous and abnormally dangerous, Defendants are strictly liable for all the damages, including punitive damages, and injuries to Plaintiffs caused by their Operations

## COUNT IV: MEDICAL MONITORING TRUST FUNDS

172.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

173.    As set forth above, as a result of the Defendants negligent, knowing and intentional torts, and/or reckless acts and/or omissions, Plaintiffs have been exposed to hazardous and radioactive substances that were greater than background levels.

174.    As a proximate result of their exposure, Plaintiffs were sickened, and such illnesses and negative health effects may worsen and progress on a daily basis.

175.    As a proximate result of their exposure to such hazardous and radioactive substances, Plaintiffs have a significantly increased risk of contracting serious latent diseases.

176.    Neither Defendant has employed any type of mitigation or assistance in monitoring or treating any types of health issues of Plaintiffs.

177.     A monitoring procedure exists that makes the early detection of diseases possible.

178.     Such early detection will help to ameliorate the severity of the diseases. The prescribed monitoring regime is different from that normally recommended in the absence of exposure.

179.     The Defendants are liable for and are compelled to establish medical monitoring trust funds for each Plaintiff.

## COUNT V: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

180.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

181.     The conduct of Defendants described herein was intentionally outrageous and extreme, resulting in severe emotional distress of Plaintiffs.

182.     Defendants knew that the Operations were sickening Plaintiffs and that they were children yet ignored this fact and intentionally and recklessly continued the Operations while making public comments to discredit and undermine Plaintiffs and Plaintiffs' guardians.

183.     Defendants knew that the Operations concealed the true nature of the Operations and the risks they posed to Plaintiffs, including the exposure to radiation and hazardous chemicals, and that they were unknown to Plaintiffs and Plaintiffs' guardians.

184.     The medical reports for Plaintiffs also evidence grievous and outrageous harm to Plaintiffs from the Operations.

185.     Defendants knew that the Operations exhibited intentional and reckless conduct so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community, particularly in case

of the harms that were inflicted upon and the distress caused to Plaintiffs, who are children.

186.    Plaintiffs suffer distress on a daily basis as they constantly experience the lingering mental and physical effects of the Operations, while at the same time fearing future negative health outcomes.

187.    Defendants have taken no action to relieve the severe emotional distress of Plaintiffs.

188.    Defendants are liable for negligent, intentional, reckless, outrageous, and atrocious conduct, and the resulting damages, including physical injury, suffered by Plaintiffs, and for punitive damages.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants, together with punitive damages, and other relief, including costs of suit, reasonable attorney and expert fees as well as such further relief that this Honorable Court deems just and proper.

## JURY TRIAL DEMANDED

Respectfully submitted,

*/s/ Michael J. Bruzzese*
Michael J. Bruzzese, Esq.
Pa. I.D. No. 63306
220 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
(412) 281-8676
mjb@mjblawoffice.com
*Counsel for the Plaintiffs*

Lisa Johnson, Esq.
Pa. I.D. No. 200101
Lisa Johnson & Associates
1800 Murray Ave., #81728
Pittsburgh, PA 15217
412-913-8583

lisa@lajteam.com

Dated: August 6, 2025                              *Counsel for Plaintiffs*