**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| P.T., a minor, by and through her natural guardians Scott Tennant and Abigail Tennant, G.H., a minor, by and through his natural guardians Glenn Hollabaugh and Trina Hollabaugh, B.K., a minor, by and through her natural guardians Matthew Kennedy and Dia Kennedy, and J.K., a minor, by and through her natural guardians Matthew Kennedy and Dia Kennedy, | ) | No. 2:25-01203 |
| | ) | Judge Robert J. Colville |
| Plaintiffs, | ) | |
| v. | ) | |
| EQT PRODUCTION COMPANY and EQT XL MIDSTREAM OPERATING LLC, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Robert J. Colville, United States District Judge

Before the Court is a Motion to Dismiss (ECF No. 16) filed by Defendants EQT Production Company ("EQT Production") and EQT XL Midstream ("EQT Midstream" and, together with EQT Production, "Defendants"). Defendants move to dismiss all counts in Plaintiffs' Complaint (ECF No. 1), arguing that Plaintiffs have failed to state a claim upon which relief can be granted. The Court has jurisdiction to rule on this matter pursuant to 28 U.S.C. § 1332(a). The Motion has been fully briefed and is ripe for disposition.

## I. Factual Background & Procedural History

In the Complaint, Plaintiffs sets forth the following factual allegations relevant to the Court's consideration of the Motions at issue:

Plaintiff P.T., Plaintiff G.H., Plaintiff B.K., and Plaintiff J.K. are all minors, represented through their respective guardians. ECF No. 1 ¶ 1. Since 2021, EQT Production has operated eight unconventional natural gas wells (the "Gas Wells") on the Sizemore Pad in Wetzel County, West Virginia, using hydraulic fracturing ("fracking") to extract natural gas from underground shale. *Id.* ¶¶ 27–28, 32, 35. At all relevant times, Plaintiff P.T.'s home sat approximately 1,700 feet from the Gas Wells; Plaintiff G.H.'s home sat approximately 2,400 feet from the Gas Wells; Plaintiff B.K.'s home sat within 2,000 feet from the Gas Wells; and Plaintiff J.K.'s home sat within 2,000 feet from the Gas Wells. *Id.* ¶¶ 50–52.

Since 2010, EQT Midstream has operated the Knob Fork Compressor Station (the "Compressor Station" and, along with the Gas Wells, the "Facilities") in Wetzel County, West Virginia, which processes and compresses natural gas. *Id.* ¶¶ 12–13. At all relevant times, Plaintiff P.T.'s home sat approximately 2,700 feet from the Compressor Station; Plaintiff G.H.'s home sat approximately 3,400 feet from the Compressor Station; Plaintiff B.K.'s home sat within 2,500 feet from the Compressor Station; and Plaintiff J.K.'s home sat within 2,500 feet from the Compressor Station. *Id.* ¶¶ 23–25. Each home is downgradient and sits at a lower elevation than the Gas Wells and three of the four houses sit at lower elevation than the Compressor Station. *Id.* ¶¶ 26, 53.

Plaintiffs allege that the Facilities emitted pollutants that were hazardous to human health, including benzene, toluene, xylene, and other volatile organic compounds, and that EQT Production's fracking operations also generated and stored mixed hazardous oil and gas waste, which includes naturally occurring radioactive material and technologically enhanced naturally occurring radioactive material. *Id.* ¶¶ 17, 29–38.

Medical testing of each of Plaintiffs has shown exposure to, and elevated levels of, specific chemicals associated with Defendants' operations, some reaching over ninety times the average

level. *Id.* ¶¶ 67–70, 86–88, 105–107, 118–120. Each Plaintiff has suffered numerous ailments due to this exposure, including physical, cognitive, and emotional conditions, and each family was forced to abandon its home because of the ailments. *Id.* ¶¶ 71–128

On August 6, 2025, Plaintiffs filed this lawsuit, bringing claims for Private Nuisance, Negligence, Strict Liability, and Negligent Infliction of Emotional Distress ("NIED"), and asking for the establishment of a Medical Monitoring Trust Fund. On November 20, 2025, Defendants filed a Motion to Dismiss, along with a Brief in Support (ECF No. 17). On December 11, 2025, Plaintiffs filed a Response Brief (ECF No. 19) to the Motion to Dismiss. On December 17, 2025, Defendants filed a Reply Brief (ECF No. 20) to Plaintiffs' Response.

## II. Legal Standard

### A. Failure to State a Claim

Defendants have moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits, but simply accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 554). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The Supreme Court of the United States has explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

The United States Court of Appeals for the Third Circuit instructs that "a court reviewing the sufficiency of a complaint must take three steps." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). The court explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." (citation and editorial marks omitted)). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

*Connelly*, 809 F.3d at 787. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (internal citations omitted).

In addition to reviewing the facts contained in the complaint, a court may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). When a document integral to or relied upon in the complaint is included, the court may also

consider that document. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

Although a district court is not obligated to permit leave to amend before dismissing a complaint in a non-civil rights case, *Wolfington v. Reconstructive Orthopaedic Assocs. II P.C.*, 935 F.3d 187, 210 (3d Cir. 2019), courts generally grant leave to amend unless amendment of the complaint would be inequitable or futile. *See, e.g.*, *Bachtell v. Gen. Mills, Inc.*, 422 F. Supp. 3d 900, 915 (M.D. Pa. Oct. 1, 2019) (citing *Phillips v. Allegheny Cty.*, 515 F.3d 224, 245 (3d Cir. 2008)).

## III. Discussion

### A. Count III – Strict Liability

Defendants move to dismiss the Strict Liability claim, arguing that West Virginia law does not treat oil and gas operations as abnormally dangerous. Plaintiffs respond that the elements of a Strict Liability claim are met, and Defendants have mischaracterized the allegations in the Complaint respecting the activities of the Facilities.

West Virginia law adopts the Restatement (Second) of Torts as to Strict Liability. *Letart v. Union Carbide Corp.*, 461 F. Supp. 3d 391, 395 (S.D.W. Va. 2020) (citing *Crum v. Equity Inns, Inc.*, 685 S.E.2d 219, 230 (2009)). Under the Restatement:

> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
> (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Restatement (Second) of Torts, § 519 (1976). "Whether an activity or instrumentality qualifies as 'abnormally dangerous' is a question of law for the court." *Courtland Co., Inc. v. Union Carbide Corp.*, No. 2:19-CV00894, 2020 WL 5047131, at *16 (S.D.W. Va. Aug. 26, 2020) (citing *Crum*,

685 S.E.2d at 231). A person who carries on an "abnormally dangerous" activity is liable for the resulting harm even if "he has exercised the utmost care to prevent [it]." *Crum*, 685 S.E.2d at 230. However, as the Restatement states, a defendant is strictly liable not for all resulting harm, but for the sort of harm that causes the activity to be considered abnormally dangerous.

Courts in West Virginia assessing abnormal danger typically do a six-factor analysis as prescribed by the Restatement. The factors are:

a. existence of a high degree of risk of some harm to the person, land or chattels of others;

b. likelihood that the harm that results from it will be great;

c. inability to eliminate the risk by the exercise of reasonable care;

d. extent to which the activity is not a matter of common usage;

e. inappropriateness of the activity to the place where it is carried on; and

f. extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts, § 520. The common-law principle underlying this analysis was first announced in the English case of *Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868), and the balancing test has been dubbed the *Rylands* analysis. *See Bowers v. Wurzburg*, 528 S.E.2d 475, 482 (1999).

Defendants posit that the *Rylands* analysis does not apply here, arguing that, pursuant to *Foster v. City of Keyser*, West Virginia's highest court has already established that harm caused by resource extraction and natural gas transportation is not abnormally dangerous for strict liability purposes. *Foster v. City of Keyser*, 501 S.E.2d 165 (W. Va. 1997). Defendants also cite the more recent *Nottingham v. Equitrans* and *Lovejoy v. Jackson Resources Company*, which found that transporting natural gas through a pipeline, like the kind that Defendants claim EQT Midstream operates, is not an abnormally dangerous activity. *Nottingham v. Equitrans, LP, et al.*, CC-48-

2024-C-27 (W. Va. Cir. Ct.—Tyler County May 9, 2025); *Lovejoy v. Jackson Resources Co.*, No. 2:20-CV-00537, 2021 WL 3025454 (S.D.W. Va. July 6, 2021).

*Foster* dealt only with methods of transporting and supplying natural gas, but did not deal with extraction and production. In another of Defendants' cited authorities, the *Bowers* case, the West Virginia Supreme Court of Appeals found that "the storage, sale, or distribution of gasoline is subject to the same *Rylands* analysis . . . that we would apply to any other activity involving similar or greater danger to the public." *Id.* at 484. *Bowers* also offers a rebuttal to Defendants' argument that the social utility of its business activities is too great and its application too widespread to hold Defendants strictly liable. "The utility of his conduct may be such that he is socially justified in proceeding with his activity, but the unavoidable risk of harm that is inherent in it requires that it be carried on at his peril, rather than at the expense of the innocent person who suffers harm as a result of it." *Id.* at 483 (citing Restatement (Second) of Torts, § 520, Comment on clause (c)). In other words, commonality and community value are just two of the *Rylands* analysis factors, but they do not categorically and perforce outweigh the remaining analysis. In fact, *Crum* indicates that the *Rylands* analysis should apply not only to the sale and distribution of gasoline, but also those activities that involve "similar or greater danger to the public." *Crum*, 685 S.E.2d at 231 (citing *Bowers*, 528 S.E.2d 475). Accordingly, the Court will address the question of abnormal danger as to each of Defendants and the business operations that led to the alleged injuries:

**1. EQT Production's Gas Wells**

The Complaint alleges that EQT Production drills, fracks, generates, stores, and emits hazardous chemicals and radioactive materials. Defendants point out that courts have repeatedly found that fracking is not an abnormally dangerous activity for strict liability purposes. *See, e.g.*,

*Kamuck v. Shell Energy Hldgs. GP*, LLC, No. 4:11- cv-1425, 2015 WL 1345235, at *17 (M.D. Pa. Mar. 25, 2015) ("[N]atural gas drilling activities, including hydraulic fracturing, do not constitute abnormally dangerous activities under Pennsylvania law."); *Ely v. Cabot Oil & Gas Corp.*, 38 F. Supp. 3d 518 (M.D. Pa. 2014) ("[N]o court in the United States has chosen to . . . declare hydraulic fracturing to be an ultra-hazardous activity that gives rise to strict tort liability."); *Frederick v. Allegheny Twp. Zoning Hearing Bd.*, 196 A.3d 677, 689 n.17 (Pa. Commw. Ct. 2018) ("Notably, a gas well operator engaged in hydraulic fracturing and drilling operations is not subject to strict liability in tort.").

Conspicuously absent from Defendants' string citation are cases that control here. The case that Defendants do cite from West Virginia, *In re Flood*, is not as emphatic about excluding extractive activities from strict liability claims. *In re Flood Litigation*, 607 S.E.2d 863 (W. Va. 2004). In fact, in that case, the Supreme Court of Appeals did a full *Rylands* analysis, a very strong indication that the sort of activities the defendants engaged in was not categorically foreclosed from strict liability. *Id.* at 874. But more importantly, in that *Rylands* analysis, the *Flood* court was not contending with the potentially abnormally dangerous activity that this Court considers here, but rather a secondary harm that extractive activities may cause and for which there are measures to reduce the risk. *Id.* ("[A]ny increased risk of flooding which results from [the defendant's] extractive activities can be greatly reduced by the exercise of due care."). As the Court noted earlier, a plaintiff alleging harm caused by an abnormally dangerous activity can nevertheless fail to support a strict liability claim if the sort of harm alleged is not what makes the activity abnormally dangerous. *Crum*, 685 S.E.2d at 230.

Ultimately, Defendants have failed to show fair analogues to adequately argue that West Virginia law does not allow strict liability to attach to extractive activities, and the Court has not

independently found that to be the case. However, the Court has found courts within this Circuit applying Section 520 of the Restatement and the *Rylands* analysis to allow strict liability claims to proceed past the pleading stage with facts respecting comparable toxic substance extracting and handling. *See, e.g.*, *Berish v. Sw. Energy Prod. Co.*, 763 F. Supp. 2d 702, 706 (M.D. Pa. 2011) (declining to dismiss a strict liability claim against a defendant who used fracking techniques that discharged hazardous materials because the determination is fact-intensive and better resolved after discovery); *see also Fiorentino v. Cabot Oil & Gas Corp.*, 750 F. Supp. 2d 506, 512 (M.D. Pa. 2010) ("While we understand that there is case law that suggests that [certain activities] are not subject [to] strict liability, we believe it improvident to automatically extend this reasoning to drilling activities without more thorough consideration. Plainly, the record at this early juncture is insufficiently developed for the Court to render an informed decision as to whether this line of cases and the logic expressed therein should apply to the gas-well drilling activities at bar. Therefore, we will deny Defendants' Motion to Dismiss with respect to [the strict liability claim]."). While these cases do not construe West Virginia law, in the absence of clear guidance on the specific, ultimately non-dispositive issue Defendants raise, the Court considers them highly persuasive.

Additionally, Plaintiffs do not predicate their Strict Liability claim against EQT Production only on the allegation that the Gas Wells engaged in fracking and other extractive activities. In fact, a large portion of the Complaint is dedicated to the dangers of storing hazardous materials. *See, e.g.*, ECF No. 1 ¶ 38. ("Mixed Hazardous and Radioactive Oil and Gas Waste was generated by each Gas Well and stored on the pad, generating the emission of pollutants, including radioactive particulate, that were hazardous to the environment and human health."). Defendants have provided no argument as to whether strict liability predicated on storage of hazardous

materials can proceed. However, *Courtland v. Union Carbide*, a case Defendants cite to establish that abnormal danger is a question of law and not fact, turns out to be quite factually analogous. *Courtland Co., Inc. v. Union Carbide Corp.*, No. 2:19-CV00894, 2020 WL 5047131 (S.D.W. Va. Aug. 26, 2020). In that case, the court denied the motion to dismiss as to a strict liability claim premised on allegations respecting the defendant's storage, control, use, and transportation of certain hazardous substances. *Id.* at *17. Applying the *Rylands* analysis (under West Virginia law), the *Courtland* court found that, until the parties conducted further discovery, the court lacked sufficient knowledge to conduct a fully informed analysis. *Id.*

This Court agrees. Drawing all reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs may be able to establish Strict Liability against EQT Production.

**2. EQT Midstream's Compressor Station**

Defendants assert that the Compressor Station's function is to compress natural gas for pipeline transportation, and is therefore governed by *Foster*. In *Foster*, the Supreme Court of Appeals of West Virginia found that plaintiffs suing for harm caused by the transportation of natural gas must seek their remedy, not in strict liability, but in negligence, where the duty of care corresponds to the risk of harm. *Foster*, 501 S.E.2d at 174. However, the premise of Defendants' argument, that EQT Midstream's Compressor Station is strictly a transportation operation, is not alleged in the Complaint. Instead, Plaintiffs allege that "the Compressor Station was constructed and thereafter operated to process and compress natural gas using at least six 1,775 horsepower engines [and] is clearly an industrial use as it processes raw materials." ECF No. 1 ¶ 13–14. Because the Complaint categorizes the Compressor Station as an industrial processing and compression station, rather than a station that merely facilitates transportation, the Court cannot conclude that *Foster* forecloses Count III from proceeding against EQT Midstream.

The more recent cases cited by Defendants are likewise not persuasive here. As in *Foster*, the *Nottingham* court's decision relied on the fact that the defendant *transported* natural gas, a fact not alleged here. *Nottingham*, CC-48-2024-C-27, at *4. The *Lovejoy* case cited by Defendants is the least persuasive, as the plaintiff there conceded the strict liability claim, and so the court declined to provide a thorough analysis. *Lovejoy*, 2021 WL 3025454, at *9.

Ultimately, as is the case with the claim against EQT Production, it is premature to demand that Plaintiffs establish matters such as how much the value outweighs the danger, common usage, and inappropriateness. However, the Court finds that Plaintiffs have adequately alleged that they may be capable of establishing a number of the factors. Plaintiffs allege that preventing all emissions was technologically impossible, establishing a high degree of risk and that reasonable care could not mitigate the risk. ECF No. 1 ¶ 19. It claims compressor station emissions generally cause acute and chronic health issues, such as cancer, asthma, and cardiovascular, neurological, and respiratory issues, establishing, at least to some degree, that there is a likelihood that the harm caused by emissions would be great. *Id.* ¶¶ 63–64. The industrial scale of the operation, as pled, suggests that this activity is not a matter common usage. *Id.* ¶¶ 13–14. If other elements are established, it may be possible to establish that it is inappropriate to carry out this operation within 2,500 feet of a residential area. *Id.* ¶¶ 23–25.

Weighing all these factors in a light favorable to Plaintiffs, the Court finds that Plaintiffs have satisfied their burden to proceed with a Strict Liability claim against EQT Midstream. Accordingly, as to the Strict Liability claim, the Court will deny the Motion to Dismiss.

**B. Count IV – Medical Monitoring Trust Fund**

Defendants move to dismiss the Medical Monitoring claim, arguing that, for several elements of the cause of action, Plaintiffs have simply formulaically recited the elements.

Plaintiffs respond that, due to the nature of the cause of action, certain elements only need to be alleged generally for the Court to infer the plausibility of the claim.

The Fourth Circuit Court of Appeals has found that under West Virginia law, there is "an independent tort claim for medical monitoring, which permits a plaintiff to recover the costs of diagnostic testing for diseases that may develop in the future as a result of a defendant's conduct." *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 98 (4th Cir. 2011) (citing *Bower v. Westinghouse Elec. Corp.*, 522 S.E.2d 424, 431 (1999)). To establish a claim for medical monitoring, a plaintiff must allege facts showing:

1. Significant exposure to hazardous substances;
2. Scientific evidence showing a link between exposure of the substances and human disease;
3. Tortious conduct by the defendant;
4. Exposure to the substances creates an increased risk of contracting the disease;
5. Diagnostic testing is reasonably necessary; and
6. Medical monitoring for the disease exists.

*Bower*, 522 S.E.2d at 433.

Defendants appear to concede that the first three elements are adequately alleged, and, given that the Complaint alleges the individualized health monitoring results, the identified chemicals, and the facility-specific emission and provides scientific data, the Court agrees. As to element four, Defendants argue that Plaintiffs have not identified which substances are alleged to have caused the increased risk of each specific disease of each particular Plaintiff, pointing to, what Defendants characterize as, the "conclusory" assertions that Plaintiffs were "sickened" and "have a significantly increased risk of contracting serious latent diseases." ECF No. 17 at 11

(quoting ECF No. 1 ¶¶ 174–175). While Defendants claim that this is little more than a restatement of element four, the Court disagrees. Plaintiffs have alleged more than a generic assertion that they have an increased risk of contracting disease. The factual background identifies a peer-reviewed study showing that children living within one mile of facilities like Defendants' face "a 5-7 times higher risk of developing a rare childhood cancer" and alleges that all of Plaintiffs' homes sat within one mile of the Facilities. ECF No. 1 ¶¶ 62, 23–26, 50–53. That strikes the Court as a plausible link between exposure to the particular substances and at least a narrow category of disease.

Defendants argue that elements five and six of the cause of action are completely ignored in the Complaint, but ultimately do identify what they label as conclusory allegation that a "monitoring procedure exists" and that this unnamed "monitoring regime is different from that normally recommended." ECF No. 17 at 11 (quoting ECF No. 1 ¶¶ 177–178). The Court agrees that these allegations are conclusory. The Complaint fails to identify the monitoring protocol, and describes no testing labels, examination schedules, or even a medical basis for concluding that Plaintiffs require anything but ordinary medical care. *See, e.g, Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 694 S.E.2d 815 (2010) ("[T]he circuit court adopted the medical monitoring plan described by the Plaintiffs' expert, Dr. Charles Werntz . . . [and] concluded that the duration of the plan would be forty years based upon the latency periods of various cancers associated with exposure to arsenic, cadmium, and lead, and would include: (1) medical screening every two years, (2) informed consent by the patient with regard to testing and (3) review by the circuit court every five years.").

Plaintiffs respond that under *Bower*, Plaintiffs need not show that a treatment currently exists for the disease that is the subject of medical monitoring. This is correct, but is not responsive

to Defendants' argument. The *Bower* court differentiates a monitoring protocol from treatment, finding that while an available treatment for the disease is not necessary to establish medical monitoring, if diagnostic testing is not available "then periodic monitoring is of no assistance and the cost of such monitoring is not available." *Bower*, 522 S.E.2d at 433 (quoting *Bourgeois v. A.P. Green Indus., Inc.*, 716 So.2d 355, 361 (La.1998)).

Plaintiffs also invoke *Bower*'s discussion of what interest medical monitoring is designed to protect. "It is difficult to dispute that Plaintiffs have an interest in avoiding expensive diagnostic examinations just as he or she has an interest in avoiding physical injury." ECF No. 18 at 14. But this dictum in *Bower* is speaking to the policy rationale for the tort of medical monitoring generally. As the Bower court explains, "The 'injury' that underlies a claim for medical monitoring—just as with any other cause of action sounding in tort—is 'the invasion of any legally protected interest.' As one of the first courts to grapple with this subject observed: 'It is difficult to dispute that an individual has an interest in avoiding expensive diagnostic examinations just as he or she has an interest in avoiding physical injury. When a defendant negligently invades this interest, the injury to which is neither speculative nor resistant to proof, it is elementary that the defendant should make the plaintiff whole by paying for the examinations.'" *Bower*, 522 S.E.2d at 430 (quoting Restatement (Second) of Torts § 7(1); *Friends for All Child., Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 826 (D.C.Cir. 1984)). In short, this passage does not describe a substitute for pleading as to each element of the cause of action.

Elements five and six are essential to the success of the claim. The very relief sought cannot be adequately evaluated without knowing what monitoring regime could potentially help Plaintiffs. Accordingly, as to the Medical Monitoring claim, the Court finds that Plaintiffs have

failed to state a claim, and the Court will grant the Motion to Dismiss as to Count IV without prejudice.

**C. Count V – Negligent Infliction of Emotional Distress**

Defendants move to dismiss the NIED claim, arguing that Plaintiffs' allegations about the fear of contracting a disease are too conclusory to sustain an NIED claim. Plaintiffs respond that the current state of West Virginia law does not require more specific pleading.

To state a claim for NIED in West Virginia, a Plaintiff must allege: "(1) that the defendant engaged in negligent conduct; (2) that the plaintiff suffered serious emotional distress; and (3) that the defendant's negligent conduct was a cause of the serious emotional distress." *Mowery v. Logan Cnty. Bd. of Educ.*, 2012 WL 895921, at *6 (S.D.W. Va. Mar. 15, 2012). A claim for NIED typically requires a physical injury, except under narrow circumstances. "A claim for emotional distress without an accompanying physical injury can only be successfully maintained upon a showing by the plaintiffs in such an action of facts sufficient to guarantee that the claim is not spurious and upon a showing that the emotional distress is undoubtedly real and serious." *Barbina v. Curry*, 650 S.E.2d 140, 142 (2007). One of the recognized narrow exceptions to the physical injury requirement is distress that emerges from a fear of contracting a disease. *See Travis v. JP Morgan Chase Bank, N.A.*, No. 1:12-CV-89, 2012 WL 3193341, at *5 (N.D.W. Va. Aug. 6, 2012) (outlining the exceptions to the physical injury requirement, including the fear of disease exception). "In order to recover for negligent infliction of emotional distress based upon the fear of contracting a disease, a plaintiff must prove that he or she was actually exposed to the disease by the negligent conduct of the defendant, that his or her serious emotional distress was reasonably foreseeable, and that he or she actually suffered serious emotional distress as a direct result of the exposure." *Marlin v. Bill Rich Const., Inc.*, 482 S.E.2d 620, 624 (1996).

In their Response, Plaintiffs rely heavily upon *Campbell v. Kuhnle Brothers*, a 2024 case in the Northern District of West Virginia denying the defendant summary judgment on an NIED claim arising from a chemical spill on the plaintiff's property. *Campbell v. Kuhnle Bros., Inc.*, No. 1:22-CV-148, 2024 WL 4216638 (N.D.W. Va. Sept. 17, 2024). Plaintiffs seem to argue that, given the recency of *Campbell*, it would appear that the framework wherein there are only particular narrow exceptions to the physical injury requirement has been somewhat relaxed. While the Court disagrees that the framework has broadened, the Response, nonetheless, highlights the fact that the case at bar has several factual parallels to *Campbell* and argues that it should be disposed of in the same way. And here the Court agrees.

The Complaint satisfies the first element of an NIED claim, exposure to disease through negligence, because the Negligence claim survives this Motion and by alleging that Plaintiffs face "a significantly increased risk of contracting serious latent diseases" due to Defendants' actions. *Id.* ¶ 175. Plaintiffs satisfy the second element, the foreseeability of the distress, by including evidence of epidemiological findings that those who live at Plaintiffs' geographic distance from such facilities as those described in this case are at a considerably higher risk of developing a rare childhood cancer, thereby establishing a known risk. And the third element, actual emotional distress, is satisfied by the allegation that "Plaintiffs suffer distress on a daily basis as they constantly experience the lingering mental and physical effects of the Operations, while at the same time fearing future negative health outcomes." ECF No. 1 ¶ 186. The Complaint alleges further that Plaintiff P.T. suffers from anxiety, depression, and PTSD, that Plaintiff G.H. suffers from depression and anxiety, that Plaintiff B.K. suffers from anxiety, depression, and panic attacks, and that Plaintiff J.K. suffers from trauma that has impacted her ability to maintain relationships and engage in her usual daily activities. *Id.* ¶¶ 76, 90, 104, 125–128.

Accordingly, the Court finds that Plaintiffs have stated a claim for NIED, and so, as to Count V, the Court will deny the Motion to Dismiss.

**D. Count I – Private Nuisance**

Defendants move to dismiss the Private Nuisance claim, arguing that Plaintiffs fail to allege harm to a property interest and that all allegations of intentionality are conclusory. Plaintiffs respond that the Complaint alleges that Defendants interfered with Plaintiffs' private use and enjoyment of their homes and that state of mind can be satisfied without intentionality.

Under West Virginia law, a private nuisance is "a substantial and unreasonable interference with the private use and enjoyment of another's land," and recovery is "is limited to plaintiffs who have suffered a significant harm to their property rights or privileges caused by the interference." *Hendricks v. Stalnaker*, 380 S.E.2d 198, 200–201 (1989) (citing Restatement (Second) of Torts, §§ 821E, 821F). Private nuisance "includes conduct that is intentional and unreasonable, negligent or reckless, or that results in . . . abnormally dangerous conditions or activities in an inappropriate place." *Yoho v. Sw. Energy Co.*, 688 F. Supp. 3d 345, 354 (N.D.W. Va. 2023) (quoting *Hendricks*, 380 S.E.2d at 200).

Defendants are correct that Plaintiff's Private Nuisance claim cannot rest on personal injury alone. But that is not what is pled here. Defendants' assertion that in Court I of the Complaint "Plaintiffs' allegations of harm focus on alleged health impacts, not property impacts," is simply inaccurate. Count I clearly states that pollutants "prevented the Plaintiffs from living in their Homes and enjoying the surrounding environment," a callback to the factual background, which alleges that airborne pollutants "permeated the interior of the Homes," causing all of Plaintiffs' families to abandon their homes due to contamination. ECF No. 1 ¶¶ 20, 84, 92, 108, 121. Nuisance law has long been recognized to cover odors, fumes, or contaminants that make a home

physically uninhabitable or that cause inhabitants to become ill. *See, e.g.*, *Evans v. Moffat*, 192 Pa. Super. 204, 160 A.2d 465 (1960). The Complaint's allegations of forced abandonment plausibly allege the sort of property harm *Hendricks* demands, and so on this theory, Defendants' Motion fails.

Defendants' second argument against the Private Nuisance claim, that Plaintiffs fail to properly allege intentionality, likewise fails. Plaintiffs plead specific, non-conclusory facts bearing on negligence and reckless conduct, including both Defendants' failure to fully disclose all its chemical use, a known containment failure in 2022, a plume of emissions flowing toward Plaintiffs' homes, and an EPA investigation into Defendants' pollution control methods. ECF No. 1 ¶ 16, 30, 40, 41–45. At the pleading stage, such allegations are sufficient to support at least one of the mental states necessary to establish the Private Nuisance claim.

Accordingly, the Court finds that Plaintiffs have properly stated a claim for Private Nuisance, and so, as to Count I, the Court will deny the Motion to Dismiss.

**E. Shotgun Pleading**

Defendants seek dismissal of all counts for "shotgun pleading," arguing that the Complaint fails to give each Defendant fair notice of the claims against it and the grounds on which each claim rests. Plaintiffs respond that the facts alleged sufficiently support the claims raised and the relief sought.

Under Federal Rule of Civil Procedure 8(a), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." The Third Circuit Court has sought "to eliminate the all too common shotgun pleading approach to . . . equal protection claims." *Hynson By & Through Hynson v. City of Chester Legal Dep't*, 864 F.2d 1026, 1031, n.13 (3d Cir. 1988). "[T]his disfavored approach follows one of four

different tacts [sic]: (1) 'a complaint containing multiple counts where each count adopts the allegations of all preceding counts'; (2) a complaint that is 'replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action'; (3) a complaint that does 'not separat[e] into a different count each cause of action or claim for relief'; and (4) a complaint that 'assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.'" *Doe v. Quinones*, 2018 WL 1955133 (W.D. Pa. Apr. 5, 2018), *report and recommendation adopted*, 2018 WL 1951094 (W.D. Pa. Apr. 25, 2018) (quoting *Bartol v. Barrowclough*, 251 F. Supp. 3d 855, 859 (E.D. Pa. May 3, 2017)).

The Complaint here bears only a mild version of the first category of a shotgun pleading, that each count incorporates the preceding paragraphs. But in the Court's experience, this is a common and unremarkable convention of complaint drafting. The second shotgun pleading category is not present here, either, as the Court was easily able to identify the significance of the facts alleged and their connection to the claims. While Counts IV did rest on certain conclusory allegations, that deficiency was easily addressed in the Court's analysis, a testament to the Complaint's organization. The Court cannot justify dismissing an entire complaint as inadequately pled because some of the facts alleged in one of the many claims are conclusory, especially when, after independent analysis, several of the claims survive a motion to dismiss. The Complaint does not include the third category at all, as each claim is given its own section and explanation.

And as to the fourth category of shotgun pleading, the Complaint here is materially different from the sort of indiscriminate multi-defendant cases Defendant cites. Throughout the factual background in the Complaint, EQT Production and EQT Midstream are each tied to their own distinct facilities, operations, and emissions. Defendant-specific facts are then recalled in the

claims. For instance, under Count I, Plaintiffs describe the particular Facility for each Defendant, and specify different chemical emissions from the two. Under Count III, the Court had no trouble examining the different operations of each Defendant as alleged in the Complaint to analyze the Strict Liability claim. This is quite different from pleadings from a plaintiff suing several unrelated defendants and never identifying which defendant did what and which claims are brought against which defendant. If the Court can readily determine which allegations are tied to which Defendant, it has every expectation that Defendants can do so as well, and they are therefore given fair notice as to the claims.

Accordingly, the Court finds that the Complaint's allegations and claims do not constitute shotgun pleading, and so, to the extent that the Motion seeks dismissal of the Complaint in its entirety on shotgun pleading grounds, the Motion is denied.

## IV. Conclusion

For the reasons discussed above, the Court will grant in part and deny in part Defendants' Motions to Dismiss. Count IV will be dismissed without prejudice, and the Court will grant Plaintiffs leave to amend their complaint within 21 days of the date of this Memorandum. An appropriate Order of Court follows.

BY THE COURT:

*/s/Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: September 23, 2026

cc: All counsel of record,